UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE RAKOFF

---------------------------------------------------------------X

SPAR (2004) L.P.,

                  PLAINTIFF,

   - AGAINST -

NEW STREAM INSURANCE, LLC
and NEW STREAM CAPITAL, LLC,

              DEFENDANTS.

---------------------------------------------------------------X

07 CV 3300

Index No. _____

**COMPLAINT**

**Jury Trial Demanded**

*RECEIVED APR 2 5 2007 U.S.D.C. S.D. N.Y. CASHIERS*

    Plaintiff SPAR (2004) L.P., by and through its attorneys, Trachtenberg Rodes & Friedberg LLP, as and for its Complaint against defendants New Stream Insurance, LLC and New Stream Capital, LLC, alleges as follows:

### PARTIES, JURISDICTION AND VENUE

    1.    Plaintiff SPAR (2004) L.P., formerly known as SPAR L.P., ("SPAR" or "Plaintiff") is a limited partnership duly organized and existing under the laws of the State of New York with its principal place of business at 507 South Prospect Avenue, Clearwater, Florida, 33756. SPAR changed its name from SPAR L.P. to SPAR (2004) L.P. on September 26, 2005.

    2.    Defendant New Stream Insurance, LLC, formerly known as Assurance Investments, LLC, ("New Stream Insurance") is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business at 38-A Grove Street, Suite 201, Ridgefield, CT 06877. New Stream Insurance

changed its name from Assurance Investments, LLC to New Stream Insurance, LLC on February 28, 2006.

3.      Defendant New Stream Capital, LLC, formerly known as Porter Capital Management, LLC, ("New Stream Capital") is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business at 38-A Grove Street, Suite 201, Ridgefield, CT 06877. New Stream Capital changed its name from Porter Capital Management, LLC to New Stream Capital Management, LLC on February 28, 2006 and changed its name again to New Stream Capital, LLC on March 9, 2006.

4.      The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 inasmuch as the citizenship of the parties is diverse and the amount in controversy exceeds $75,000.

6.      This court has personal jurisdiction over defendants pursuant to New York Civil Practice Law and Rules §§ 301 and 302 inasmuch as defendants are doing business in New York and the claims herein arise out of defendants' transaction of business in New York.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

8.      Plaintiff SPAR has expertise in sourcing and administering investment opportunities in life settlement assets for investors.

9.    Defendant New Stream Insurance is an investment fund that invests funds contributed to it by its clients.

10.    New Stream Insurance invests in life settlement assets by buying life insurance policies and recording them in a special purpose account (the "Fund") within New Stream Insurance.

11.    Defendant New Stream Capital is in the business of managing and administering New Stream Insurance's investments, including its investments in the life settlement assets recorded in the Fund.

12.    On or about July 1, 2004, SPAR (formerly known as SPAR L.P.), New Stream Insurance (formerly known as Assurance Investments, LLC), and New Stream Capital (former known as Porter Capital Management, LLC) executed an agreement (the "Agreement").  A copy of the Agreement is annexed hereto as Exhibit A.

13.    The Agreement provided that New Stream Capital "appoint[ed] SPAR . . . to source investment opportunities in life settlement assets . . . for review and selection by [New Stream Capital] on behalf of the Fund. . . ."  Exhibit A, ¶ 6.

14.    Under the terms of the Agreement, New Stream Insurance and New Stream Capital agreed that SPAR would be the exclusive source of life settlement assets for investment by the Fund.

15.    Specifically, the Agreement provided that New Stream Capital would advise SPAR from time to time "of the amount of funds it has available to employ in the acquisition of life settlement assets on behalf of the Fund" and that SPAR would use its best efforts to originate life settlement assets for purchase by the Fund "to the full extent of [New Stream Capital's] available funds".  Exhibit A, ¶ 7.

16.     Similarly, the Agreement provided that ". . . the Fund will invest only in (i) life settlement assets through this Agreement and (ii) Permitted Temporary Investments [defined as time deposits, bankers' acceptances, certificates of deposit, money market funds, and demand deposits]".  Exhibit A, ¶¶ 1, 32 and 33.

17.     In addition, the Agreement provided that New Stream Insurance and New Stream Capital would "not directly source any life settlement assets from a provider or broker introduced to [New Stream Capital] by SPAR or through whom SPAR has originated assets for presentation to [New Stream Capital] or the Fund."  Exhibit A, ¶ 43.

18.     As consideration for SPAR's efforts in sourcing life settlement investment opportunities for New Stream Insurance, New Stream Insurance and New Stream Capital agreed that the Fund would pay SPAR:

      a.  a monthly services fee (the "Services Fee") equaling 0.083333% (1% per annum) of the fair market value of the Fund's Net Assets at the end of the previous calendar month; and,

      b.  an annual share of the profits of the Fund (the "Profit Share") equaling 10% of the new profits that the Fund had experienced on its Net Assets during the preceding fiscal year.

Exhibit A, ¶ 24 and Schedule A.

19.     The Services Fee was due and payable "in no event later than the tenth (10th) Business Day of [each] month".  Exhibit A, ¶ 24 and Schedule A.

20.     The Agreement provided that both the Services Fee and the Profit Share were to be calculated on the basis of all assets held by the Fund.

21.     Specifically, the Agreement provided that both the Services Fee and the Profit Share were to be calculated as a percentage of the "Net Assets" of the Fund, which it defined as "the assets of the Fund". Exhibit A, Schedule A.

22.     The Agreement provided that Defendants were to provide SPAR with a monthly Fund account statement.  Exhibit A, ¶ 11.

23.     SPAR has fully performed all of its duties and obligations under the Agreement.

24.     SPAR has reviewed and priced sound life settlement asset investment opportunities having aggregate face amounts of over $1.1 billion and presented such investment opportunities for selection by New Stream Capital on behalf of the Fund.

25.     To date, Defendants have caused the Fund to invest in life settlement assets sourced by SPAR having aggregate face amounts of only approximately $160,000,000.

26.     Defendants have caused the Fund not to invest in numerous sound life settlement assets sourced by SPAR without any reasonable basis or cause for doing so.

27.     Defendants have caused the Fund to acquire life settlement assets having face amounts of at least $141,000,000 without utilizing SPAR as an advisor.

28.     Defendants have caused the Fund to acquire life settlement assets having face amounts of at least $141,000,000 from brokers and/or providers introduced to them by SPAR and/or through whom SPAR had originated assets for presentation to Defendants, including brokers and/or providers associated with Mark Goode by the names of Life Asset Group, LLC, a broker, and Secondary Life Capital, LLC, a provider.

29.     Defendants have caused the Fund not to pay SPAR its monthly Services Fees on the portion of the Fund's assets that were acquired without utilizing SPAR as an advisor.

30.     Defendants have caused the Fund not to pay SPAR its annual Profit Share on the portion of the Fund's assets that were acquired without utilizing SPAR as an advisor.

31.     Defendants have caused the Fund not to pay SPAR its monthly Services Fees on the portion of the Fund's assets that were acquired from brokers and/or providers introduced to them by SPAR and/or through whom SPAR had originated assets for presentation to Defendants.

32.     Defendants have caused the Fund not to pay SPAR its annual Profit Share on the portion of the Fund's assets that were acquired from brokers and/or providers introduced to them by SPAR and/or through whom SPAR had originated assets for presentation to Defendants.

33.     Defendants have caused the Fund not to pay SPAR any Services Fees or its Profit Share during 2007.

34.     The Fund will continue to owe SPAR a monthly Services Fee and an annual Profit Share until the maturity of the life insurance policies in the Fund and the distribution of all the assets of the Fund.

35.     Defendants have failed to provide SPAR with monthly Fund account statements.

36.    New Stream Capital failed to advise SPAR accurately and failed to advise SPAR from time to time "of the amount of funds it ha[d] available to employ in the acquisition of life settlement assets on behalf of the Fund".

37.    Defendants have intentionally withheld information regarding the extent of the Fund's asset holdings from SPAR in an attempt to hide their wrongful acquisitions and breaches from SPAR.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

38.    Plaintiff repeats and realleges every allegation set forth above as if set forth fully herein.

39.    Defendants breached the Agreement by causing the Fund to secretly acquire life settlement assets without using SPAR as an advisor.

40.    Defendants breached the Agreement by causing the Fund to secretly acquire life settlement assets from one or more brokers or providers introduced to Defendants by SPAR.

41.    Defendants breached the Agreement by causing the Fund to secretly acquire life settlement assets from one or more brokers or providers from whom SPAR had originated assets for presentation to Defendants.

42.    Defendants breached the Agreement by causing the Fund not to pay SPAR its monthly Services Fees on the full value of the Fund's Net Assets.

43.    Defendants breached the Agreement by causing the Fund not to pay SPAR its annual Profit Share on the full value of the Fund's Net Assets.

44.    Defendants breached the Agreement by causing the Fund not to pay SPAR any part of its monthly Services Fees during any portion of calendar year 2007.

45.    Defendants breached the Agreement by causing the Fund not to pay SPAR any part of the annual Profit Share due in April 2007 for accounting year 2006.

46.    Defendants breached the Agreement by failing to provide SPAR with monthly Fund account statements.

47.    Defendants breached the Agreement by failing to advise SPAR accurately and failing to advise SPAR from time to time "of the amount of funds it ha[d] available to employ in the acquisition of life settlement assets on behalf of the Fund".

48.    The amount of the Services Fees which Defendants have caused the Fund not to pay to SPAR during the period between July 1, 2004 and April 10, 2007 on the assets Defendants wrongfully acquired without utilizing SPAR as an advisor was at least $450,000.

49.    The amount of the Profit Share which Defendants have caused the Fund not to pay to SPAR for the accounting years 2004, 2005 and 2006 on the assets Defendants wrongfully acquired without utilizing SPAR as an advisor was at least $1,110,000.

50.    The amount of the Services Fees which Defendants have caused the Fund not to pay to SPAR during the months of January, February, March and April 2007 on the assets Defendants acquired utilizing SPAR as an advisor was at least $205,000.

51.    The amount of the Profit Share for 2006 which Defendants have caused the Fund not to pay to SPAR during April 2007 on the assets Defendants acquired utilizing SPAR as an advisor was at least $825,000.

52.    Plaintiff has been injured as a direct and proximate result of Defendants' breaches of the Agreement in an amount to be established at trial but in no event less than the sum of (i) $450,000 for the Services Fees which were due and payable to SPAR on the assets Defendants have wrongfully acquired without utilizing SPAR as an advisor; (ii) $1,110,000 for the Profit Share which was due and payable to SPAR on the assets Defendants have wrongfully acquired without utilizing SPAR as an advisor; (iii) $205,000 for the Services Fees which were due and payable to SPAR for the months of January, February, March and April 2007 on the assets Defendants have acquired utilizing SPAR as an advisor; (iv) $825,000 for the Profit Share for 2006 which was due and payable to SPAR in April 2007 on the assets Defendants have acquired utilizing SPAR as an advisor; (v) $5,900,000 for the aggregate Services Fees payable for all subsequent months of the Agreement on the assets Defendants have acquired utilizing SPAR as an advisor; (vi) $7,485,000 for the aggregate Profit Share for 2007 and all subsequent years of the Agreement on the assets Defendants have acquired utilizing SPAR as an advisor; (vii) $2,765,000 for the aggregate Services Fees payable for all subsequent months of the Agreement on the assets Defendants have wrongfully acquired without utilizing SPAR as an advisor; and (viii) $1,535,000 for the aggregate Profit Share for 2007 and all subsequent years of the Agreement on the assets Defendants have wrongfully acquired without utilizing SPAR as an advisor.

WHEREFORE, plaintiff SPAR (2004) L.P. respectfully requests that this Court enter judgment as follows:

A)    On the first claim for relief, in an amount to be determined at trial but in no event less than $ 20,275,000, plus interest; and

B)      For such other and further relief as is just and proper, including costs, disbursements and reasonable attorney's fees.

Dated: New York, New York
        April 25, 2007

                                TRACHTENBERG RODES & FRIEDBERG, LLP

                                By: _____
                                        David G. Trachtenberg (6675)

                                        545 Fifth Avenue
                                        New York, NY 10018
                                        (212) 972-2929

                                Attorneys for Plaintiff SPAR L.P.

# Exhibit A

# AGREEMENT

**THIS AGREEMENT** is made as of the 1st day of July, 2004, between **Assurance Investments, LLC**, a limited liability company organized under the laws of Delaware ("**Assurance**"); **Porter Capital Management, LLC** a limited liability company organized under the laws of Delaware (the "**Manager**"); and **SPAR L.P.**, a limited partnership organized under the laws of New York by its general partner, SPAR LLC ("**SPAR**").

**RECITALS:**

A.    Assurance Investments, LLC has established a special purpose account known as "Account No. 1" (the "**Fund**") and the Manager acts as the manager of the Fund;

B.    The assets of the Fund are intended to be invested in life settlement assets (the "**Investable Assets**"); and

C.    The Manager desires to appoint SPAR to source and administer investment opportunities in life settlement assets for the Fund in accordance with the terms of this Agreement.

**NOW THEREFORE** in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree as follows:

<u>**Definitions and Interpretation**</u>

1.    In this Agreement:

"**affiliate**" has the meaning attributed to it in the Corporation Law of the State Of New York, as amended from time to time, and the meaning of which, as of the date hereof, is set out in the Guidelines;

"**Agreement**" means this agreement as it may be amended or supplemented from time to time, and the expressions "**hereto**", "**herein**", "**hereof**", "**hereby**", "**hereunder**" and similar expressions refer to this agreement and include every instrument supplemental or ancillary to this agreement and, unless otherwise indicated, references to sections, paragraphs and subparagraphs are to sections, paragraphs and subparagraphs in this agreement;

"**Business Day**" means any day on which the New York Stock Exchange is open for business and other than Saturday, Sunday and any statutory holiday in the State of New York;

"**Guidelines**" means the investment objective, the investment restrictions and practices set out in Schedule "B".

"**Permitted Temporary Investments**" means (a) time deposits in, or bankers' acceptances or certificates of deposit issued by, any bank, depository institution or trust company organized under the laws of the United States of America or any state thereof subject to supervision and examination by United States or state banking or depository institution authorities and having, to the knowledge of the Fund at the time such investment is made or committed, reported capital and surplus in excess of $100,000,000, (b) investments in money market funds rated in the highest investment category by Moody's Investors Services, Inc. or Standard & Poor's

**CONFIDENTIAL**

-2-

Corporation at the time of the investment or commitment to invest therein, and (e) demand deposits in any bank, depository institution or trust company referred to in (a) above.

**Headings and Interpretation**

2.  The inclusion of headings in this Agreement is for convenience of reference only and shall not affect the construction or interpretation hereof.

3.  In this Agreement, unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

**Governing Law, Submission to Jurisdiction and Dispute Resolution**

4.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware. The Fund, the Manager and SPAR each hereby waives any right to a trial by jury. Notwithstanding the foregoing, if a dispute should arise between the Parties concerning matters dealt with in this Agreement, the Parties agree that their authorized representatives will timely meet and negotiate in good faith to resolve any problems or disputes that may arise in performance of the terms and provisions of this Agreement.

**Invalidity of Provisions**

5.  Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof.

**Appointment**

6.  The Manager hereby appoints SPAR, on the terms and conditions set out herein, to source investment opportunities in life settlement assets having the characteristics set out in the Guidelines for review and selection by the Manager on behalf of the Fund and to provide the other services set out herein during the term of this Agreement. SPAR accepts such appointment on the terms and conditions set forth herein and agrees to discharge its duties under this Agreement solely in the interest of the Fund with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**Duties of SPAR**

7.  The Manager will advise SPAR at from time to time of the amount of funds it has available to employ in the acquisition of life settlement assets on behalf of the Fund. SPAR will use its reasonable best efforts to originate life settlement assets for purchase by the Fund to the full extent of the Manager's available funds.

8.  SPAR will advise the Manager of the availability of investment opportunities on behalf of the Fund by delivering to the Manager a package of information in agreed form containing information requested by the Manager, including, without limiting the generality of the foregoing, the information listed in Schedule "D". (SPAR will also inform the Manager of every life settlement asset referred to SPAR by its origination network which SPAR believes should not

**CONFIDENTIAL**

-3-

be evaluated fully for purchase, together with the reason for that belief.) Upon receipt of the package, the Manager will promptly review the material, discuss it with SPAR and instruct SPAR whether or not to bid on the assets described in the package at the price recommended by SPAR. SPAR's authority to bid on life settlement assets on behalf of the Fund shall be limited to the assets and prices for which it has received instructions in writing from the Manager. Unless otherwise agreed by the Parties, if the Manager does not respond within five (5) Business Days, it shall be deemed to have instructed SPAR not to bid on the opportunities presented by SPAR in that package. In any event, SPAR shall have no obligation to bid on life settlement assets on behalf of the Fund unless instructed to do so by the Manager in accordance with this section 8.

9. If the Manager has approved a specific investment opportunity, SPAR shall bid on the Fund's behalf on the life settlement assets so approved. If bids are accepted, SPAR shall notify the Manager and attend to coordinating the purchase of the approved life settlement assets, including obtaining all evidences of title to such life settlement assets at closing against delivery by the Fund of the purchase price, and such other closing documents as is customary for the purchase of life settlement assets. Title to all Investable Assets will be taken in the name of the Fund or an account for the Fund.

10. SPAR shall not be responsible for the custody of the assets of the Fund other than to settle transactions and deliver all evidences of title to Investable Assets directly to the Manager or as it may direct from time to time. SPAR shall make available to the Manager and the Fund all documentation in its possession or control, whether in hard copy or electronically, relating to any Investable Asset purchased by the Fund. If property of the Fund is delivered to SPAR, it shall promptly deliver the same to the Manager.

11. The Manager will provide SPAR with a monthly statement of the Fund within ten (10) Business Days of the end of each month and SPAR will have the right, on reasonable notice, to inspect the books and records of the Fund at the Manager's office during the Manager's normal business hours. It is expressly understood and agreed that ownership of the assets in the Fund shall remain with the Fund at all times and under all circumstances.

12. Upon the purchase of a life settlement asset by the Fund, SPAR shall notify the Manager of the date or dates upon which premiums are due in respect of the life settlement asset. No less than five (5) Business Days prior to the first day of each month during the term of this Agreement, SPAR will notify the Manager of the total amount required to pay premiums falling due during that month in respect of the Investable Assets then owned by the Fund, provided that SPAR shall have no liability for errors or omissions in the provision of such information.

13. SPAR shall make arrangements to track the mortality of the persons insured under Investable Assets owned by the Fund from time to time, it being understood and acknowledged that SPAR will engage third-party service providers to effect the tracking. When SPAR is notified of the death of such an insured person, SPAR will notify the Manager and supervise and coordinate the collection of any death benefits due to the Fund as a result of the death.

14. Notwithstanding anything in this Agreement to the contrary, the Manager and the Fund acknowledge and agree that the Fund, not SPAR, is solely responsible for the payment of premiums due in respect of any life settlements owned by the Fund from time to time and the Manager and the Fund acknowledge that they are aware that a life settlement asset may lapse if the premiums thereunder are not paid on a timely basis.

15. In addition to the foregoing, SPAR shall:

**CONFIDENTIAL**

-4-

a.  upon reasonable notice and in a mutually agreed upon format and medium, provide or cause to be provided to the Manager such periodic reports (but in no event less than monthly) regarding SPAR's activities hereunder as the Manager may reasonably request;

b.  furnish such other support services as the Manager may reasonably require and as to which the Manager and SPAR may from time to time agree,;

c.  make principals of SPAR knowledgeable about SPAR's activities hereunder available to discuss such activities by telephone as the Manager may reasonably request or in person at a mutually agreed location in the greater New York City area as the Manager may reasonably request;

d.  provide or cause to be provided such information as the Manager may require for reports to investors in the Fund or to meet regulatory requirements or requests relating in any manner to the Investable Assets, whether made pursuant to law or regulatory policy; and

e.  at the request of the Manager, review with the Manager the Guidelines for the Fund.

### Relationship with the Fund and the Manager

16. SPAR acknowledges that it understands the terms of the Guidelines of the Fund and agrees to source investment opportunities consistent therewith. The Manager may make changes to the terms of the Guidelines of the Fund at any time, and agrees to advise SPAR in writing of any change. SPAR agrees to source investment opportunities consistent with any such changes.

17. SPAR agrees to comply with any directions relating to the Investable Assets given by the Manager provided that prior to taking any such action, the Manager shall consult with SPAR with respect to any such proposed direction. The Manager acknowledges that SPAR shall not be liable for acting on such instructions.

18. SPAR shall be entitled to assume that any information received from the Manager, the Fund or their authorized representatives pursuant to this Agreement is accurate and complete (provided that, respecting information derived by the Manager or the Fund from a person other than the Manager or the Fund or their affiliates, the Manager's and the Fund's respective obligations hereunder shall be limited to using commercially reasonable efforts to ensure that the information is accurate and complete and contains no misrepresentation) and no liability shall be incurred by SPAR as a result of any error in such information or any failure to receive any notices required to be delivered pursuant to this Agreement.

19. The Manager and the Fund shall be entitled to assume that any information received from SPAR' or its authorized representatives pursuant to this Agreement is accurate and complete (provided that, respecting information derived by SPAR from a person other than SPAR or its affiliates, SPAR's obligation hereunder shall be limited to using commercially reasonable efforts to ensure that the information is accurate and complete and contains no misrepresentation) and no liability shall be incurred by the Manager or the Fund as a result of any error in such information or any failure to receive any notices required to be delivered pursuant to this Agreement.

20. The Manager and its duly appointed representatives shall have access at all reasonable times and on reasonable notice to all books and records maintained by SPAR relating to the Fund during the term of this Agreement.

21. The parties agree that SPAR shall not be responsible for the preparation or filing or any report required of the Fund by any governmental or regulatory authority. The Manager and the Fund acknowledge and agree that SPAR is not responsible for providing advice on, or take into

**CONFIDENTIAL**

account, any tax, accounting or liability issues resulting from the Fund investing in life settlement assets.

22. During the term of this Agreement, the Fund and the Manager shall furnish to SPAR at its principal office copies of all offering documents, proxy statements, reports to investors, sales literature, or other promotional material prepared for distribution to investors in the Fund or the public, which refer to SPAR or its clients in any way, at a reasonable time prior to the use thereof, and the Fund and the Manager shall not use any such materials if SPAR reasonably objects in writing five Business Days (or such other time as may be mutually agreed) after receipt thereof. The Fund and the Manager shall ensure that materials prepared by employees or agents of the Fund, Manager or their affiliates that refer to SPAR or its clients in any way are consistent with those materials previously approved by SPAR as referenced in the preceding sentence.

## Confidentiality

23. The parties agree to execute the Confidentiality Agreement attached hereto as Schedule C.

## Fees and Expenses

24. In consideration of the services provided by SPAR pursuant to this Agreement, the Fund agrees to pay to SPAR the fees in the amount and at the times set forth in Schedule "A".

25. If at any time prior to the termination of this Agreement SPAR agrees to provide services to another client in respect of life settlement assets on terms more advantageous to the other client than those set out in Schedule "A", then the fees set out in Schedule "A" will be adjusted prospectively to match the terms provided to the other client.

26. Fees paid to SPAR by brokers, or other soft-dollar arrangements, for the benefit of SPAR or its principals or affiliates, is strictly prohibited. SPAR may deal only with brokers that are reputable, qualified and financially sound as SPAR in good faith judgment may choose.

27. The Fund, the Manager and SPAR shall each pay for their own expenses. However, Fund agrees to reimburse SPAR for any direct costs related to the origination, purchase, servicing and collection of the Investable Assets within 30 days of submission of documented expenses. Expenses over $500 shall be pre-approved by the Fund.

## Liability and Indemnification

28. SPAR shall at all times be indemnified and saved harmless by the Fund and the Manager from and against all claims whatsoever, including costs (including legal costs on a solicitor and his own client basis and expenses), charges and expenses in connection therewith, brought, commenced or prosecuted against it for or in respect of any act, deed, matter or thing whatsoever made, done, acquiesced in or omitted in or about or in relation to the execution of its duties hereunder. Nothing herein shall be deemed to protect SPAR against any liability to the Fund or the Manager in respect of any matter relating to this Agreement in any circumstance where there has been gross negligence or willful misconduct on the part of SPAR.

29. The Fund and the Manager shall at all times be indemnified and saved harmless by SPAR from and against all claims whatsoever, including costs (including legal costs on a solicitor and his own client basis and expenses), charges and expenses in connection therewith, brought, commenced or prosecuted against it for or in respect of any act, deed, matter or thing whatsoever

**CONFIDENTIAL**

-6-

made, done, acquiesced in or omitted in or about or in relation to the execution of its duties hereunder. Nothing herein shall be deemed to protect the Fund or the Manager against any liability to SPAR in respect of any matter relating to this Agreement in any circumstance where there has been gross negligence or willful misconduct on the part of the Fund or the Manager.

30. For greater certainty, SPAR shall not be liable to the Fund or to the Manager for any loss or diminution in the value of the Investable Assets acquired by the Fund.

## Representation and Warranties; Additional Covenants

31. SPAR represents and warrants to the Fund and to the Manager that:

   a. it is a limited partnership duly organized and validly existing under the laws of the State of New York;

   b. it has the power and capacity to enter into, and to perform its obligations under, this Agreement;

   c. this Agreement has been duly authorized, executed and delivered and constitutes a valid and binding obligation, enforceable in accordance with its terms;

   d. the execution, delivery and performance of this Agreement by SPAR will not violate or result in any default under SPAR's constating documents, any other agreement to which SPAR is a party or its assets may be found, or any statute or any rule, regulation or order of any government agency or body; and

   e. it is providing the services under this Agreement on condition that it is not required to be registered pursuant to the *U.S. Investment Advisors Act of 1940* (as amended) (the "**40 Act**") or under any other law to provide the services contemplated hereunder.

32. The Fund represents and warrants to SPAR that:

   a. it is a limited liability company duly organized and validly existing under the laws of Delaware;

   b. it has the power and capacity to enter into, and to perform its obligations under, this Agreement;

   c. this Agreement has been duly authorized, executed and delivered and constitutes a valid and binding obligation, enforceable in accordance with its terms;

   d. the execution, delivery and performance of this Agreement by the Fund will not violate or result in any default under the Fund's constating documents, any other agreement to which the Fund is a party or its assets may be bound, or any statute or any rule, regulation or order of any government agency or body; and

   e. the Fund will invest only in (i) life settlement assets through this Agreement and (ii) Permitted Temporary Investments.

33. The Manager represents and warrants to SPAR that:

   a. it is a limited liability company duly organized and validly existing under the laws of Delaware;

**CONFIDENTIAL**

-7-

b.  it has the power and capacity to enter into, and to perform its obligations under, this Agreement;

c.  this Agreement has been duly authorized, executed and delivered and constitutes a valid and binding obligation, enforceable in accordance with its terms;

d.  the execution, delivery and performance of this Agreement by the Manager will not violate or result in any default under the Manager's constating documents, any other agreement to which the  is a party or its assets may be bound, or any statute or any rule, regulation or order of any government agency or body;

e.  it is the duly authorized manager of the Fund; and

f.  the Fund will invest only in (i) life settlement assets through this Agreement and (ii) Permitted Temporary Investments.

## Term and Termination

34.  This Agreement shall continue in full force and effect until terminated in accordance with the following:

a.  This Agreement may be terminated at the request of the Manager or SPAR upon prior written notice to the other parties.  The termination, in whole or in part, shall be effective on the date specified in the notice, which shall not be less than ninety (90) days after delivery of the notice, or such earlier date as may be agreed upon by the parties.

b.  This Agreement may be immediately terminated by any party by notice in writing to the other parties if another party shall cease to carry on business, become bankrupt or insolvent, resolve to wind up or liquidate or if a receiver of any of the assets of another party is appointed.

c.  This Agreement may be immediately terminated by any party by notice in writing to the other parties if the terminating party establishes that another party has committed any fraud or material wrongdoing in conducting its business.

d.  This Agreement may be immediately terminated by SPAR if SPAR is required to become registered pursuant to the 40 Act or other securities legislation in the United States or elsewhere, in order to provide its services hereunder.

35.  Upon termination of this Agreement, SPAR shall forthwith deliver to the Manager all records, documents and books of account, and all materials and supplies which have been supplied by the Manager to SPAR, which are still in the possession or control of SPAR provided, however, that SPAR may retain notarial or other copies of such records, documents and books of account and the Manager shall produce at its principal office the originals of such records, documents and books of account whenever reasonably required to do so by SPAR for the purpose of legal proceedings or dealings with any governmental authorities.

36.  Notwithstanding the termination of this Agreement by the Manager for itself and on behalf of the Fund, the obligation of the Fund to pay to SPAR both the Services Fee and the Profit Sharing Fee set out in Schedule "A" hereto (as amended in accordance with this Agreement as of the termination date) with respect to the Investable Assets previously acquired by the Fund as a

**CONFIDENTIAL**

-8-

result of SPAR bringing such investment opportunity to the Manager shall survive the termination of this Agreement and shall be payable until the date contemplated in Schedule A.

37. Notwithstanding the termination of this Agreement by SPAR, the obligation of the Fund to pay to SPAR the Profit Sharing Fee set out in Schedule "A" hereto (as amended in accordance with this Agreement as of the termination date) with respect to the assets previously acquired on behalf of the Fund as a result of SPAR bringing such investment opportunity to the Manager, shall survive the termination of this Agreement and shall continue until the date contemplated in Schedule A. For greater certainty, SPAR shall, from the date of termination, no longer be entitled to its Asset Service Fee with respect to the assets acquired by the Fund.

## Restrictions on SPAR and the Manager

38. The Fund and the Manager acknowledge that SPAR may provide similar services to other persons, companies or entities.

39. The Manager agrees that it will not, within the one-hundred-twenty-(120)-day period following the presentation to the Manager by SPAR of a life settlement asset that the Manager declines to purchase, offer that asset to any other client of SPAR or acquire that specific asset for its own account or the account of any of its clients. SPAR agrees that, if SPAR terminates this Agreement pursuant to Section 33(a), it will not, during the ninety-(90)-day period following the termination, offer to others a life settlement asset previously offered to and accepted by the Manager or acquire any such asset which, for any reason other than the Fund's failure to fund the purchase, has not been acquired by the Fund.

40. SPAR agrees that it will not give any other person, company or entity priority over the Fund in the presentation of life settlement assets for investment and will act in good faith and follow a policy of allocating investment opportunities to the Manager on behalf of the Fund on a basis that is fair and equitable to the Fund relative to investment opportunities allocated to other clients of SPAR. SPAR shall not be liable to account to the Fund for any profit, commission or remuneration made or received by reason of such allocation policy.

41. SPAR will provide the Manager on a monthly basis a list of all the life settlement assets that have been acquired by clients of SPAR other than the Fund pursuant to the presentation of an investment opportunity to the acquirer by SPAR, including, with respect to each asset, the face amount, the age of the insured, the life expectancy, the annual premiums and the acquisition price. For greater certainty, SPAR shall not be required to disclose the identity of the insured, of the other parties, or of the broker or provider involved. For greater certainty, any information provided pursuant to this Section 36 shall be subject to the confidentiality provision of section 19.

42. SPAR agrees that, during the term of this Agreement, it shall not enter into an exclusive agreement to provide similar services to any other person, company or entity which agreement would prohibit it from continuing to provide its services to the Fund.

43. During the term of this Agreement, the Manager agrees that it will not directly source any life settlement assets from a provider or broker introduced to the Manager by SPAR or through whom SPAR has originated assets for presentation to the Manager or the Fund.

**CONFIDENTIAL**

-9-

## Amendments

44. This Agreement may not be amended or modified in any respect except by written instrument signed by the parties hereto.

## Notices

45. Except as otherwise provided, any notice or other communication required or permitted to be given hereunder shall be in writing and shall be given by facsimile or other means of electronic communication or by delivery as hereafter provided. Any notice or other communication, if sent by facsimile or other means of electronic communication, shall be deemed to have been received on the Business Day following the sending, or if delivered by hand shall be deemed to have been received at the time it is delivered to the applicable address noted below either to the individual designated below or to an individual at such address having apparent authority to accept deliveries on behalf of the addressee. Notice of change of address shall be governed by this section. Notices and other communications shall be addressed as follows:

**if to the Fund:**

**ASSURANCE INVESTMENTS, LLC**
38-A Grove Street, Suite 201
Ridgefield, CT 06877

Attention: Bart Gutekunst

Fax No.: 203-431-6112

**if to the Manager:**

**PORTER CAPITAL MANAGEMENT, LLC**
38-A Grove Street, Suite 201
Ridgefield, CT 06877

Attention: Bart Gutekunst, Managing Partner

Fax No.: 203-431-6112

**if to SPAR:**

**SPAR L.P.**
12th Floor
261 Madison Avenue
New York, N.Y. 10016

Attention: Andrew Plevin
President
SPAR L.P.

Fax No.: 212-208-2695

## Assignment

46. This Agreement shall not be assignable by either party hereto, without the express prior written consent of the other party hereto.

## CONFIDENTIAL

-10-

**Enurement**

47. This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

**Counterparts**

48. This Agreement may be executed in any number of counterparts all of which taken together shall constitute this Agreement.

**Nature of Agreement**

49. This Agreement is not intended to be and shall not be treated as anything other than an agreement relating to the provision of investment opportunity services in life settlement assets, with the rights of the parties being none other than the rights ascribed to them under this Agreement. Without limitation, this Agreement shall not be deemed in any way or for any purpose to constitute any party a partner, employee or agent of another party to this Agreement in the conduct of any business or otherwise or a member of a joint venture or joint enterprise with any other party to this Agreement.

**Entire Agreement**

50. This Agreement and the schedules referred to herein constitute the entire agreement between the parties hereto and supersede all prior agreements, representations, warranties, statements, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof.

**IN WITNESS WHEREOF** the parties have executed this Agreement.

**ASSURANCE INVESTMENTS, LLC**

by its general partner, Porter Capital Management, LLC

By: _____
Name: ■  Boris Gartalant
Title: ■  managing Partner

**Porter Capital Management, LLC**

By: _____
Name: ■  Boris Gartalant
Title: ■  managing Partner

**SPAR LP,**

by its general partner SPAR LLC

By: _____
Name:    Andrew Plevin
Title:    President

**CONFIDENTIAL**

-11-

# Schedule "A"

## COMPENSATION RATES

**A. Fees paid to SPAR are:**

i    **Services Fee.** The Fund will pay SPAR a monthly service fee (the "Services Fee") equal to 0.083333% (1% per annum) of the Fair Market Value of the Net Assets of the Fund at the end of the previous calendar month. Payment of the Services Fee shall be made by the Fund contemporaneous with the delivery by the Manager of the monthly statement referred to in Section 11 above, but in no event later than the tenth (10th) Business Day of the month. All payments are made in arrears and no payments shall be made in advance.

ii   **Profit Share.**  Within ten (10) Business Days of the closing of the Fund's financial statements for a particular calendar year (but in no event later than the 30th of April in the following year), the Fund will pay SPAR the "**Profit Share**" (as defined below). The Manager will compute the "**Profit Share**" (as defined below) as of the last day of each year and deliver to SPAR an accounting of its calculation of the Profit Share for that period in sufficient detail for SPAR to determine its accuracy.

iii  Fees shall be pro-rated for services rendered for any partial periods.

**B. Fees upon Termination.**

i    Upon termination of the Agreement under Section 34, SPAR shall be entitled to continue to receive the Profit Share until the maturity of the policies in the Fund at the time of termination (the "**Termination Assets**"). In that event, the Profit Share shall be calculated with reference only to those Termination Assets which remain in the Fund from time to time, with related expenses of the Fund and the manager to be pro-rated accordingly.

ii   If SPAR initiates the termination, SPAR shall only receive the Services Fee until the termination date.

iii  If the Fund initiates the termination, SPAR shall be entitled to continue to receive the Services Fee until the maturity of the Termination Assets. In that event, the Services Fee shall be calculated with reference only to those Termination Assets which remain in the Fund from time to time, with related expenses of the Fund and the manager to be pro-rated accordingly.

iv   SPAR shall be required to continue all servicing of the Termination Assets required under this Agreement in order to receive payment of any fees after termination.

**C. Definitions**

i    "**Fair Market Value**" means the fair market value as determined by the Fund's accountants and SPAR using generally accepted accounting principles.

**CONFIDENTIAL**

12

ii      **"Profit Share"**  Unless the Manager and SPAR determine otherwise, the "Profit Share" will
        be 10% of all Net New Profits experienced by the Fund for the Fiscal Year (or any portion
        thereof) for which the calculation is being made.

iii     **"Net New Profits"**, means the amount by which the Fair Market Value of the Net Assets of
        the Fund on the last day of the period (before reduction for any state tax) exceeds the Fair
        Market Value of the Net Assets of the Fund as of the High Water Date, taking into account
        (a) both realized and unrealized gains and losses, (b) income and expenses (for greater
        certainty and without limiting the generality of the foregoing: excluding marketing, audit and
        other administrative expenses of the Fund, but including legal expenses directly related to the
        purchase and servicing of assets of the Fund, additional accounting expenses directly related
        to complying with this Agreement over and above those incurred by the Manager in respect
        of its operation of Assurance, interest related to the operation of the Fund and other additional
        expenses incurred by the Manager in respect of its operation of Assurance), and (c) adjusted
        proportionately to reflect additional capital contributions to, and withdrawals and
        distributions from, the Fund.

iv      **"High Water Date"** means (a) the last date for which a Profit Share was allocated to SPAR,
        or (b) if no Profit Share has ever been allocated to SPAR , the date of this Agreement.

v       **"Net Assets"** at any time means the assets of the Fund at that time as determined by the
        Fund's accountants and SPAR using generally accepted accounting principles

**CONFIDENTIAL**

13

# Schedule "B"

### GUIDELINES FOR INVESTABLE ASSETS

On behalf of the Manager, SPAR shall seek to acquire Investable Assets that have these characteristics:

- The policy has been in force for at least two years (or otherwise be beyond the issuer's contestability period).
- The policy is issued by a United States insurance company.
- The issuer of the policy generally has a minimum rating of "A" by Moody's, Standard & Poor's, Weiss or a similar rating agency. On a pooled basis, up to 30% of the value of the Fund may be held in policies that have ratings lower than an "A" rating.
- The expected hold to maturity (based on the 80% medical LE) is under 12 years.
- The insured is not terminally ill.
- The insured is at least 65 years of age at the date of acquisition.
- The face value of the policy is not greater than $5,000,000 and not less than $50,000.

*[handwritten initials]*

**CONFIDENTIAL**

44

# Schedule "C"

## CONFIDENTIALITY AGREEMENT

**THIS CONFIDENTIALITY AGREEMENT** is made as of the 1st day of June, 2004, between **Assurance Investments, LLC,** a limited liability company organized under the laws of Delaware (the **"Fund"**); **Porter Capital Management, LLC** a limited liability company organized under the laws of Delaware (the **"Manager"**); and SPAR L.P., a limited partnership organized under the laws of New York by its general partner, SPAR LLC ("SPAR").

**RECITALS:**

A.  The Fund, the Manager and SPAR (the **"Parties"** and, individually, a **"Party"**) have entered into an agreement (the **"Main Agreement"**) of even date herewith pertaining to the life settlements asset class.

B.  Pursuant to Section 19 of that agreement, the Parties agreed to execute this Confidentiality Agreement.

C.  In connection with their rights and obligations under the Main Agreement and pursuant to the relationship thereby established, the Parties have provided and will provide one another, orally, in writing or by other means, with certain information which is either non-public, confidential or proprietary in nature. All such information provided to a Party (a **"Recipient"**), its directors, officers, employees, agents or representatives, including, without limitation, its lawyers, accountants, consultants and financial advisers (all such persons other than the Recipient herein referred to as a **"Representative"** of the Recipient) by or on behalf of another Party (the **"Provider"**), and all notes, analyses, compilations, data studies or other materials, in whatever form, prepared by the Recipient or its Representatives containing or based upon, in whole or in part, any such provided information is herein referred to as the **"Information"**.

**NOW THEREFORE** in consideration of the mutual covenants and agreements contained in this Confidentiality Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree as follows:

1.  Each Recipient and its Representatives will keep the Information confidential and will not, without the prior written consent of the Provider, disclose the Information, in any manner whatsoever, in whole or in part, and will not use the Information, directly or indirectly, for any purpose other than in connection with the Main Agreement and the relationship established thereunder. Each Recipient agrees to furnish the Information only to those Representatives who need to know the Information for the purpose of the Main Agreement and who are informed by the Recipient of the confidential nature of the Information and who agree in writing to be bound by the terms of this Confidentiality Agreement. Each Recipient agrees to be responsible for any breach of this Confidentiality Agreement by any of its Representatives. Each Recipient will make all reasonable efforts to safeguard the Information from disclosure to anyone other than as permitted hereby.

**CONFIDENTIAL**

-15-

2.  In this Confidentiality Agreement, Information shall not include material which:

    (a)  is or becomes generally available to the public other than as a result of the disclosure by a Recipient or its Representatives;

    (b)  becomes available to a Party from a source other than another Party or its Representatives or was known to a Party prior to its first disclosure to it by another Party or its Representatives (whether or not in connection with the Main Agreement) provided that the source of such information, so far as the Party is aware, is not bound by a confidentiality agreement with the other Party or its Representatives or was otherwise prohibited from transmitting the Information to the Party by a contractual or legal obligation; or

    (c)  a Party or its Representatives are required to disclose by any applicable law or regulation or competent judicial, governmental or other authority or in accordance with the requirements of any stock exchange.

3.  In the event that a Recipient or anyone to whom it transmits the Information becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any of the Information, the Recipient will provide the Provider with prompt written notice so that the Provider may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Confidentiality Agreement. In any case, the Recipient and its Representatives will disclose only that portion of the Information which in the opinion of Recipient's counsel is legally required and the Recipient will exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Information after disclosure.

4.  Each Party agrees that the a Provider shall be entitled to injunctive relief to prevent breaches of this Confidentiality Agreement, and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which the Provider may be entitled, at law or in equity. It is further understood and agreed that no failure or delay by the Provider in exercising any right, power or privilege under this Confidentiality Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or future exercise of any right, power or privilege hereunder.

5.  This Confidentiality Agreement shall be governed and construed in accordance with the laws of the State of New York and of the United States of America applicable to agreements made and to be performed within such province. Each party hereby waives any right to a trial by jury.

6.  Each of the provisions contained in this Confidentiality Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof.

7.  This Confidentiality Agreement may not be amended or modified in any respect except by written instrument signed by the all the Parties.

8.  Except as otherwise provided, any notice or other communication required or permitted to be given hereunder shall be in writing and shall be given by facsimile or other means of electronic communication or by delivery as hereafter provided. Any notice or other communication, if sent by facsimile or other means of electronic communication, shall be deemed to have been received on the

**CONFIDENTIAL**

-16-

Business Day following the sending, or if delivered by hand shall be deemed to have been received at the time it is delivered to the applicable address noted below either to the individual designated below or to an individual at such address having apparent authority to accept deliveries on behalf of the addressee. Notice of change of address shall be governed by this section. Notices and other communications shall be addressed as follows:

**if to Assurance or the Fund:**

**ASSURANCE INVESTMENTS, LLC**
38-A Grove Street, Suite 201
Ridgefield, CT 06877

Attention: Bart Gutekunst

Fax No.: 203-431-6112

**if to the Manager:**

**PORTER CAPITAL MANAGEMENT, LLC**
38-A Grove Street, Suite 201
Ridgefield, CT 06877

Attention: Bart Gutekunst
Managing Partner

Fax No.: 203-431-6112

**if to SPAR:**

**SPAR L.P.**
12th Floor
261 Madison Avenue
New York, N.Y. 10016

Attention: Andrew Plevin
President
SPAR L.P.
Fax No.: 212-208-2695

9. This Confidentiality Agreement shall not be assignable by either party hereto, without the express prior written consent of the other party hereto.

10. This Confidentiality Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

11. This Confidentiality Agreement may be executed in any number of counterparts all of which taken together shall constitute this Confidentiality Agreement.

12. This Confidentiality Agreement is not intended to be and shall not be treated as anything other than an agreement relating to the provision of information, with the rights of the parties being none other than the rights ascribed to them under this Confidentiality Agreement. Without limitation, this Confidentiality Agreement shall not be deemed in any way or for any purpose to constitute any Party a partner or agent of another Party in the conduct of any business or otherwise or a member of a joint venture or joint enterprise with any other Party.

**IN WITNESS WHEREOF** the parties have executed this Confidentiality Agreement.

**CONFIDENTIAL**

17

**ASSURANCE INVESTMENTS, LLC**
by its general partner, **Porter Capital Management, LLC**

By: _____

Name: _____

Title: _____

**Porter Capital Management, LLC**

By: _____

Name: _____

Title: _____

**SPAR LP,**

by its general partner **SPAR LLC**

By: _____

Name:    Andrew Plevin

Title:    President

**CONFIDENTIAL**

18

## Schedule "D"

### INFORMATION TO BE INCLUDED IN SPAR'S INFORMATION PACKAGE

#### Re the Insured:

Name

Date of Birth

State of Residence

Two (2) Life Expectancy (LE) Assessments, *plus* SPAR's 80% LE recommendation

A medical Life Expectancy Assessment

All other Life Expectancy Assessments in SPAR's possession or control

#### Re the Policy:

Name of Insurer

Policy Number

Date of Issue

Maturity Date

Insurer's Rating

Insurer's Verification of Coverage

Name of Provider/Broker

In-force Illustration lasting at least as long as the Insured's 80% LE

#### Re the Investment:

Expected premiums

Suggested maximum purchase price

IRR calculations based on suggested maximum purchase price and expected premiums, as follows:

> Gross IRR assuming death at 50% life expectancy date
> Net IRR* assuming death at 50% life expectancy date
> Gross IRR assuming death at 80% life expectancy date
> Net IRR* assuming death at 80% life expectancy date

---

* "Net IRR" means the IRR assuming the investment pays only 80% of the death benefit.

**CONFIDENTIAL**